849 So.2d 814 (2003)
Sylvia GREEN
v.
K-MART CORPORATION, et al.
No. 01-675.
Court of Appeal of Louisiana, Third Circuit.
June 18, 2003.
Rehearing Denied August 6, 2003.
*818 Steven P. Shea, Islamorada, FL, James Wattigny, Lafayette, LA, For Plaintiff and Appellee/Appellant, Sylvia Green, Joseph Broussard, Lameka Broussard, and Leola Celestine.
Ian Alexander MacDonald, Perret, Doise, Lafayette, LA, For Defendant and Appellant/Appellee, K-Mart Corporation and Sue Hamilton.
Court composed of ULYSSES GENE THIBODEAUX, SYLVIA R. COOKS, JOHN D. SAUNDERS, BILLIE COLOMBARO WOODARD, and GLENN B. GREMILLION, JUDGES.
THIBODEAUX, Judge.
This case is before us on remand from the Louisiana Supreme Court following K-Mart Corporation's successful writ of certiorari application to that court. Sylvia Green v. K-Mart Corporation, XXXX-XXXX (La.4/4/03); 840 So.2d 1209. Oral arguments before this five-judge panel were heard on January 30, 2002, without the participation of K-Mart which was in bankruptcy proceedings at the time. The supreme court concluded:
The Court of Appeal erred in proceeding with oral argument despite the bankruptcy filing. The decision of the Court of Appeal is therefore vacated and this case is remanded to that court for reargument and decision, affording counsel for all parties the opportunity for participation therein.
Id.
All parties participated in oral arguments on April 23, 2003. Upon reconsideration following these submissions, we again affirm the judgment of the trial court as amended, reverse the judgment in part, and render our judgment for the reasons which follow.
The plaintiffs, Sylvia B. Green[1] and Joseph and Lameka Broussard, appeal the jury's damage award, and the defendants, K-Mart Corporation and Grandella S. Hamilton (an employee of the store), appeal the jury's damage award and the trial court's removal of a juror.

FACTUAL AND PROCEDURAL BACKGROUND
Green filed suit against K-Mart in May 1998, for injuries allegedly sustained in the New Iberia, Louisiana store on February 12, 1998. Green claimed she was injured by falling crawfish platters. A jury trial on the matter was held October 9-13, 2000, after which the jury awarded Green $1,452,222, in damages and held K-Mart 95% at fault and Hamilton 5% at fault.[2] The award was allocated as follows: Past medical expenses$49,000; Future medical expenses$1,000,000; Past loss of income$26,000; Loss of future earning capacity$357,000; Joseph's loss of consortium claim$10,000; and Lameka's loss of consortium claim $10,000.[3] Green, thereafter, filed a motion *819 for judgment notwithstanding the verdict and/or motion for new trial limited to the jury's failure to award general damages and abusively low loss of consortium award. The motions were denied by the trial court. Thereafter, both Green and K-Mart timely appealed the jury's verdict.
Green assigns as error:
1. The jury's failure to award general damages when they awarded substantial special damages;
2. The jury's failure to award future expenses for medical and rehabilitative care;
3. The jury's unreasonably low award for loss of consortium of Lameka and Joseph Broussard; and
4. The trial court's failure to find K-Mart vicariously and solidarily liable for the negligence of Hamilton.
K-Mart assigns as error:
1. The trial court's abuse of discretion in removing a juror in the absence of any evidence that he was disqualified to serve;
2. The jury's error in assessing K-Mart and Hamilton with liability because there was no evidence presented establishing their liability; and
3. The jury's error in awarding Green damages because she failed to establish that the expenses were or would be incurred because of any incident that occurred at K-Mart.

LAW AND DISCUSSION

Dismissal of Juror
On October 12, 2000, the fourth day of trial, Carlton Williams was disqualified to serve as a juror. Counsel for K-Mart immediately filed supervisory writs to this court, which were denied that same day, finding no abuse of discretion on the part of the trial court in disqualifying Williams. K-Mart now appeals juror Williams' disqualification and his subsequent replacement with an alternate juror. As an interlocutory judgment, we may foreclose the relitigation of this issue using the procedural principle called the "law of the case" doctrine. In this situation, the law of the case relates to "the conclusive effects of appellate rulings at the trial on remand, and ... the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case." Petition of Sewerage and Water Bd. of New Orleans, 278 So.2d 81, 83 (La.1973). However, the principle is discretionary; it should not be applied in cases where the appellate court committed palpable error in its first ruling or if it would otherwise be manifestly unjust. Id.
While we find that our former ruling denying writs pertaining to juror Williams' dismissal is conclusive, we elaborate on the reasons why we denied writs in the first instance. "Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." La.Code Civ.P. art. 1769(B). On the day the trial court disqualified Williams, it stated its reasons for doing so as follows:
We have a juror, a Mr. Carlton Williams who has not appeared for jury duty this morning. It is now ten minutes to ten. All the jurors were instructed to be here promptly at nine o'clock. The Court wants to note for the record that since the selection of Mr. Williams on Monday that attorneys from both sides have expressed some concern about Mr. Williams not paying attention, perhaps sleeping from time-to-time. The Court has also noted that and had conversations with the attorneys concerning that *820 and expressed the Court's concern at Mr. Williams' lack of attention. He has been late and has in effect disappeared from time to time at recesses causing even more concern for the Court. So, his failure to appear this morning even though we've waited for fifty minutes for him, his failure to appear this morning is no surprise to the Court. For those reasons the Court is going to declare thata vacancy due to his absence, and will appoint the first alternate juror, Mr. Melancon....
After counsel for K-Mart objected to the appointment of the alternate juror, the trial court went on to say:
I forgot to mention that I personally attempted to call the residence of Mr. Williams immediately before coming into court, that I secured the phone number from a questionnaire that was previously sent to all jurors just to provide their name, address, phone number, and basic information. I phoned thatcalled that number personally, there was no answer after a number of rings that anyone who would've been there would have heard and would have answered the telephone.
....
Let me state also for the record that since the concerns began with Mr. Williams that the Court has tried to observe him from time-to-time and his actions, and he does appear at most times not to be paying attention. He appears to be looking down at his note pad, but does not appear to be writing anything, although the Court could be misinterpreting that. Nevertheless, it's my view that his absence is indicative of his performance as a juror throughout the trial....
When juror Williams was questioned as to his tardiness, he responded that he was late because he "was watching [his] little brother and we don't have no phone.... We don't have no car, no transportation or nothing." K-Mart argues that, if we find that Williams was properly disqualified, we are in effect saying that jurors must be able to afford reliable transportation and have a telephone in order to serve on a jury. We disagree.
While these particular facts have not presented themselves in this court before, our colleagues in the first circuit addressed facts similar to those presented here. In State v. Williams, 500 So.2d 811 (La.App. 1 Cir.1986), court was scheduled to commence at 10:30 a.m., but one juror, Ms. Hatch, was not present at roll call. The bailiff telephoned the Hatch home, but no one answered. At 10:40 a.m., the court ordered that an alternate juror replace Hatch. Thereafter, while routine procedural matters were being handled, but before the commencement of the trial, Hatch arrived. The court ordered her to be jailed for failing to notify the court that she would be late. At that point, Hatch replied that she had car trouble and could not get to a telephone. The court proceeded with the alternate.
The first circuit stated that a "juror may not be discharged unless he is found incompetent to serve because of death, illness, or any other cause which renders a juror unable or disqualified to perform his duty." Id. at 814. The court went on to discuss State v. Cass, 356 So.2d 396 (La. 1977), where the trial court dismissed a juror for sleeping for two to four minutes while testimony was being presented. The supreme court found that this behavior did not constitute cause to discharge the juror and that the trial court erred in failing to allow the defendant an opportunity to explore the juror's inability to perform.
The appellate court then examined the case of State v. Clay, 441 So.2d 1227 (La. App. 1 Cir.1983), writ denied, 446 So.2d 1213 (La.1984), where the juror was discharged *821 because she called the morning of the second day of trial to say she could not attend due to a family problem. On appeal, the first circuit distinguished Clay from Cass, because in Clay, the juror was unavailable for questioning as to her ability to serve. In Cass, the juror was present to be questioned in front of the defendant. Therefore, the finding of the trial court was upheld by the first circuit because it acted in a reasonably prudent manner in replacing the juror.
The appellate court further stated that at the time the trial court was called upon to make a decision whether to replace Hatch with the alternate, she was unavailable, as her whereabouts and reason for absence were unknown; her subsequent arrival was irrelevant. Thus, in accordance with Clay, the appellate court found the trial court acted in a reasonably prudent manner in replacing the juror.
Likewise, we find that the trial court acted in a reasonably prudent manner in replacing Williams, who was fifty minutes late for court, did not telephone to indicate he would be late, was not available at the telephone number he provided to the court, and was not performing his duties as a juror. We agree with the first circuit that an absent and unavailable juror cannot be questioned as to his inability to perform his duties. Williams' eventual appearance was of no moment as the trial court could not predict when he would appear. After making reasonable efforts to contact him and delaying the progress of the trial by fifty minutes, we find the trial court did not abuse its discretion in disqualifying Williams from jury service. This assignment of error is dismissed as being without merit.

Employee's Liability
Hamilton urges that the jury committed manifest error in assessing her with five percent liability because it was based solely on her capacity as assistant manager on the date Green was injured. We agree. Allocation of fault is a factual determination subject to the manifest error rule. Theriot v. Lasseigne, 93-2661 (La.7/5/94); 640 So.2d 1305. We have adopted the criteria necessary to impose personal liability on an employee, as set forth by the supreme court in Canter v. Koehring Co., 283 So.2d 716 (La.1973). The criteria are:
1. The principal or employer owes a duty of care to the third person ... breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If *822 the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
Id. at 721.
Green argues that Hamilton's personal liability results from her "responsibility as store manager on February 12, 1998[,] and her failure to properly supervise Ms. Simmons who built the end-cap unit and stacked the platters." First, Hamilton's general administrative duties as store manager that evening do not render her personally liable for any injuries that might occur on the premises. Second, we are unable to determine upon what factual basis the jury could find that the first three requirements had been met. The record reveals that Hamilton, employed by K-Mart for over eighteen years, instructed a new employee (Nikki Simmons) to build the end-cap display. She admits that she did not train Simmons in any way as to the proper construction of the end-cap; however, it was routine K-Mart policy not to provide formal instruction on how to build displays. Nevertheless, K-Mart apparently pairs up new employees with more experienced ones so that the more experienced employees can assist the newer ones. Hamilton stated that she did not know if Simmons had been paired up with a more experienced employee or not, or if someone assisted Simmons in building the end-cap display.
The record also reveals that the display had been constructed in mid-January and had been in place for about a month before the accident. While Hamilton stated that she did not go and inspect the shelving after Simmons set up the endcap display, we do not believe this omission imposes liability on her. Also, numerous K-Mart employees walked by the endcap unit and spent time straightening the products displayed on it. The record reveals that employees are trained to look for any defects in the shelving units as they attend to these duties.
Moreover, there was no evidence that Hamilton had any personal knowledge that a potentially hazardous condition existed in the shelving unit, especially since the display had been in place for a month. With the many hats a discount store manager must wear in any one given day, we refuse to impose a particular duty that would require managers to inspect every shelf creation occurring in a large retail store. Therefore, we find it was manifestly erroneous for the jury to find Hamilton five percent at fault.

Liability
La.R.S. 9:2800.6(A) sets forth a merchant's duty to its customers, as well as a plaintiff's burden of proof. It states:
A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
In its brief, K-Mart urges that the "falling merchandise" standard set forth by the supreme court in Smith v. Toys `R' Us, Inc., 98-2085 (La.11/30/99); 754 So.2d 209, and Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00); 774 So.2d 84, are inapplicable to this case because the shelf fell, which caused the merchandise to fall. We disagree.
*823 In Smith, the plaintiff was alone in a toy aisle when she saw a large red toy falling toward her from an upper shelf. She put up her hand to deflect the toy and her thumb was injured. The plaintiff, thereafter, required surgery on her hand. In Davis, a Santa Claus figurine fell on the plaintiff. It was disputed whether a "pucker" in the shelf caused the figurine to fall. Nevertheless, the supreme court applied the "falling merchandise" standard set forth in Smith, though it did not find the defendant liable to the plaintiff. In order to show that the merchant failed to meet the above reasonable standard of care, a plaintiff, whether by direct or circumstantial evidence, must prove that a premise hazard existed. To do this, the plaintiff must show:
1) She did not cause the merchandise to fall;
2) Another customer present in the aisle at the same time did not cause the merchandise to fall;
3) The merchant's negligence was the cause of the accident. The plaintiff demonstrates the merchant's negligence when she shows that a customer or store employee caused the merchandise to be in an unsafe position that precipitated the merchandise to fall.
Smith, 754 So.2d 209.
In a falling merchandise case, the plaintiff must prove the defendant's negligence by a preponderance of the evidence. Id. This standard is met when, after considering all the evidence, it is more probable than not that causation has been established. Id. Therefore, the plaintiff's evidence must be sufficient for the factfinder to conclude that the plaintiff's injuries were caused by the defendant's negligence. Id. Once the plaintiff proves a prima facie existence of a premises hazard, the burden shifts to the defendant to show that it used reasonable care to prevent such hazards, such as periodic cleanup and inspection procedures. Id.
Although we do not find that Hamilton bears any personal responsibility, we find no manifest error in the jury's determination that K-Mart is liable to Green. The evidence supports a finding that the crawfish platters fell upon her and neither she, nor any other customer, caused the trays to fall.
Donna Francis, a K-Mart employee of twenty-three years and a department manager at the time of trial, was the first person on the scene after the shelf fell. She testified she heard the noise of the platters falling and immediately went to see what had happened. She stated that, when she first saw Green, "she was just standing there" and there was no indication that she was hurt. She went on to state that Green told her that she was "o.k." and that she noticed a slight red mark above her eyebrow. She stated that Green requested some water, so she left to get her some and to get Hamilton, the manager on duty. Upon returning, Francis stated that Green told Hamilton that she was a little dizzy. She also stated that she saw Hamilton remove the shelf, though she has no idea what happened to it after that. She did state that the shelf had been hanging from one end and that she noticed where the bracket that held the shelf was loose. Francis also testified that K-Mart did not have any formal policy with regard to the construction and maintenance of the shelving, but that inexperienced employees were to be assisted by more experienced employees and that common sense is the overall guiding principle in shelf construction. Francis did state that employees received instructions at safety meetings in looking for hazards on shelves; however, they were not instructed to look underneath the shelving for clips, *824 which provide extra security, to ensure the shelf is properly maintained.
Kevin Osborne, the Director of Operations for the metal division of LA Darling Company, the manufacturer of the shelves in question, testified that assembly instructions are provided to new K-Mart stores that are being built.
Frank Cardinal, district manager of the New Iberia K-Mart store, testified that he was not aware of any videos, pamphlets, or documentation as to end-cap display construction that would be given to a new employee. Rather, a new employee would just learn from a more experienced employee. He also stated that an employee would not stock merchandise above the sign and that, though this isn't a company policy, it is a common sense policy. He further stated that in determining how much weight a shelf can hold, an employee is to be guided by common sense.
Robert Farrell, a fifteen year K-Mart employee, was the manager of the K-mart store in question at the time of the incident. He stated that, insofar as employee direction as to the construction of endcap shelving is concerned, he would instruct an employee to start from the top to avoid obstructing the sign, cover as much peg board with merchandise as possible, work your way down to the bottom, and put shelves as needed until you come to the base. He stated he would instruct employees to secure the bracket to the frame of the shelf using a shelf tool or, more likely, a rubber mallet. He also stated that employees should check the clips on the shelf to make sure they are hammered down.
Simmons, the K-Mart employee who allegedly constructed the shelf, testified that she did not initially construct any shelves, change a shelf, or alter a shelf in any way in the month she was employed by K-Mart. She stated that she only restocked the shelves. She further stated that she was not given any instructions as to how she was to do her work, nor did she attend any safety meetings during the month of her employ. She did state that she was shown numerous films the day she was hired, but she did not remember what they were about. She stated that Hamilton did instruct her to put the trays on the shelf, which she did.
Kendall Mitchell, a friend of the Green family, accompanied Green's daughter into the K-Mart while she took pictures of the accident scene the day after the accident. The pictures revealed that the trays remained stacked on the floor and the shelf had been removed.
There was no evidence presented to suggest that another customer in the immediate area may have caused the shelf to collapse and the platters to fall. Further, Green testified that she reached down to the lower shelf to pick-up a crawfish platter and the top shelf of platters fell on her head. There is no indication that Green caused the shelf and platters to fall and, apparently, the jury found this testimony credible. Therefore, an employee or customer, at some other point in time, caused the shelf to be in such a position that it would eventually fall. The record reveals there was no formal inspection procedure to ensure the stability of the shelves. Moreover, it is plainly obvious from K-Mart's own policies that no formal instruction is given to new employees as to the correct way to install a shelf, despite the manufacturer's inclusion of instructions. Therefore, we find no error in the jury's finding that K-Mart is liable to Green, and this assignment of error is without merit.

Causation
A plaintiff bears the burden of proving the causal connection between the accident and the injuries she allegedly suffers *825 as a result. Burnaman v. Risk Mgmt., Inc., 97-250 (La.App. 3 Cir. 6/18/97), 698 So.2d 17, writ denied, 97-1832 (La.10/31/97); 703 So.2d 23. The jury was faced with the question of whether Green presented sufficient medical evidence to prove that, more probably than not, the medical treatment which followed the accident was brought on by the trauma suffered in the accident. Id. After a review of the evidence, we do not feel the jury was manifestly erroneous in finding that the platters which struck Green were the cause of many of her subsequent medical problems. Numerous experts testified regarding the cause of Green's problems, and evaluations by specialists provided conflicting information as to the cause of her problems. We present this evidence chronologically.
Dr. Craig Frederick, a general practitioner, treated Green in the emergency room. He stated that Green reported being unconscious for about ten minutes, having back and neck pain, and generally hurting all over. He stated that numerous exams performed on her were normal, except for a finding of a contusion above the right eyebrow. Dr. Frederick diagnosed Green with a concussion based on the fact that she indicated she had been unconscious. He went on to state, however, that Green's mental status was normal and that she was alert and oriented to person, place, and time. A CAT scan and MRI were performed, both of which revealed no evidence of bleeding or swelling in the brain. Green was released and given pain medication.
Dr. Robert Franklin, a physiatrist, first saw Green in February 1997, after a January 1997 motor vehicle accident, which she described to him as "severe." He stated that Green complained of "very severe constant pain in the affected areas which included neck, upper back, mid back, and low back." He found no objective symptoms, but felt that Green had a soft tissue injury or muscle strain. By June 1997, Dr. Franklin felt that Green had reached maximum medical improvement and released her for light duty work. In August 1997, Green first reported pain in her right wrist. Over the course of eight visits prior to the K-Mart accident, the last one being in January 1998, Green did not report any complaints of headaches, memory problems, dizziness, concentration problems, or attention problems. Green visited Dr. Franklin in late February 1998 and reported that the K-Mart accident had aggravated all of her pre-existing conditions. At this visit, Dr. Franklin noted that Green was attentive, cooperative, nice, and pleasant, and looked good physically. The red mark above her eye from the trays had gone away. Dr. Franklin planned to treat the aggravation of her pre-existing soft tissue injuries with medication and physical therapy. He recommended disability status pertaining to work. He next saw her in April 1998, at which the same symptoms persisted, but there was no mention of headaches.
In June 1998, Green remained essentially unchanged, but complained of headaches. By July 1998, Dr. Franklin noted that she was despondent, had poor eye contact, and was a poor historian. After concurring with her then treating neurologist, Dr. Tim Himel, Dr. Franklin felt a psychiatric evaluation was in order. In February 1999, he noted that Green had flat affect, poor eye contact, was very quiet, and would only speak when spoken to. Physically, she remained unchanged. Finally, Dr. Franklin saw Green in October 2000, and noted that she was overweight and continued to report the same subjective pain, but objectively there was nothing else he could do for her. He believed that the K-Mart accident aggravated her pre-existing soft tissue complaints, *826 but found her examinations rather unremarkable throughout his care of her. He did state that the chronic pain that existed since the motor vehicle accident could cause depression and, that as of the last visit, there was nothing, orthopedically speaking, that would prevent Green from returning to gainful employment.
Dr. Agapito Castro, a family practitioner, saw Green on February 18, 1998. Dr. Castro found Green to be alert and coherent, with limited range of motion in her neck. A neurological check was normal. She complained of upper and lower back pain, neck pain, and headaches and stated that she had been unconscious. He believed Green had a cervical strain of the neck muscles and a post-traumatic headache. In April 1998, the complaints remained the same, but Green reported she was now having trouble remembering things. A neurological check was normal, but Dr. Castro ordered an MRI to be on the safe side. The MRI results were normal. However, he also stated that CT scans and MRI's do not always show mild, defuse brain injury.
Green was referred to Dr. Himel, in June 1998, by Dr. Julio Castro. Green complained of daily headaches that were severe and incapacitating, pain in the back of the neck, and pain in the shoulder area. She described the headaches as mostly occurring in the back part of the head with throbbing, pounding, nausea, and intolerance of light and noise. Dr. Himel stated that these symptoms are consistent with a concussion. His examination revealed that Green was awake, alert, attentive, and very cooperative. She exhibited a blunted affect, i.e., she was not very responsive and did seem to be in a depressed mood. She also had psychomotor retardation or delayed ability to process information. Dr. Himel prescribed migraine headache medication and put Green on an anti-depressant, which is used also to prevent migraines. Green returned for second visit in July 1998, and reported that neither the anti-depressant nor the migraine headache medication had helped and that she was basically the same as the first visit, with the addition of having memory problems. Dr. Himel felt that Green needed a psychiatric consultation because her depression was taking over her life. He also opined that the depression was related to the concussion resulting from the K-Mart injury and/or the chronic pain syndrome due to the accident or existing from the prior car accident. He further stated that he did not believe that Green's problems were related to schizophrenia, but to the head injury she suffered in the K-Mart accident.
Dr. Carmen Palazzo, a forensic psychiatrist, first saw Green in August 1998, and described her as guarded, withdrawn, and in obvious distress. Green's preliminary diagnosis was major depression with psychotic features and post-concussive syndrome. Because of the difficulty in diagnosing Green's condition, Dr. Palazzo referred her to Dr. F. William Black, a neuropsychologist, for testing. She also referred Green to Dr. Samuel Mehr, a nuclear physician, so that he could conduct a PET scan.[4] Dr. Palazzo stated that the results of the PET scan correlated with the finding of brain injury. She opined that Green needed permanent care and would be in treatment with her indefinitely. She also stated that, due to Green's overall general inability to care for herself, she would need an attendant to assist her in her daily activities. She further testified that she was in favor of Green's interdiction; and she *827 did not believe that Green was schizophrenic because there was no family history of the disease and because of Green's former work history, which involved communicating with the public. She further noted that, although some of the PET scan results showed diminished glucose metabolism in the frontal lobes, which is highly indicative of schizophrenia, Green also had diminished glucose metabolism in the temporal lobes, which is not at all consistent with schizophrenia. Dr. Palazzo admitted having actually talked with Green on only four occasions that lasted approximately one hour each; thereafter, her associate, Randall Parent, conducted the sessions. She also admitted having spent substantially more time talking with Green's counsel than with Green herself. She further testified that, at their first August 1998 meeting, trying to elicit information from Green was like "pulling teeth." Thereafter, the following exchange occurred between Dr. Palazzo and K-Mart's counsel:
Q. All right. Now, it's my understandinglet me ask you to assume that Miss Green met with me on July 21st, 1998, approximately ten days to two weeks before your meeting with her, and during that deposition which lasted from approximately 10:35 in the morning to 1:05 in the afternoon, she sat and answered questions with restroom breaks and so forth, but sat and answered questions for approximately two and a half hours. That would be inconsistent with what you were seeing on August 5th, 1998, wouldn't it?
A. Yes, it would be.
Q. Do you have any explanation why that would be that difference in just that two week period?
A. Well, even within the few weeks between some of her appointments with us, we saw a lot of inconsistencies.
She further testified that she agreed with Dr. Black's assessment that it is difficult to determine whether Green has a fundamental disability related to a traumatic brain injury. Dr. Palazzo further stated that PET scans have not reached the clinical significance of MRI's and CT scans in terms of diagnosing brain injuries. However, it was her opinion that Green suffered an injury to her brain which was severe, disabling, and resulted from the K-Mart incident.
Parent, a clinical social worker employed by Dr. Palazzo, estimated that he personally met with Green around forty-five times for counseling sessions lasting around forty-five minutes each. He testified that the counseling was focused on Green's depression symptoms, including lack of motivation, crying spells, changes in appetite, and changes in sleep habits. He stated that her condition has taken a heavy toll on her children, who are also exhibiting signs of depression. He also admitted that some of Green's depression could be attributed to her mother's death as she had described the relationship as a close one. Additionally, he stated that Green reported to him that she was seeing the "little green man," but that the hallucinations stopped shortly after she was prescribed an anti-psychotic medication.
Dr. Black first saw Green on December 7, 1998, and issued a neuropsychological report on December 15, 1998, and a supplemental report on July 26, 1999. Dr. Black's testing included psychological testing and an interview, all of which lasted about seven hours. He reported that Green complained of headaches, neck and back pain, right arm pain, weak legs, depression, lack of appetite, no sense of taste, vision problems, hearing problems, numbness, loss of memory, and dizziness. *828 He stated that some of these symptoms are consistent with a minor closed head injury whereas others were not. For example, Dr. Black believed that the lack of ability to taste would not be expected, he thought the vision problems were age related, and he did not notice any hearing problem. He also said that she was attentive throughout the interview, though nonresponsive at times. However, he noted that "it was interesting that the patient appears to be distracted only when asked about attention and concentration, stating that she had forgotten the question." Dr. Black also stated that he felt Green was depressed, but he generally did not find any disorganized or psychotic thought process nor any significant levels of anxiety. However, he did mention that Green mentioned seeing the "little green man" who would come and talk to her. He found this singular incidence of visual and auditory hallucination unusual and was somewhat suspicious of its authenticity.
Generally, he found Green to be disinterested and apathetic toward the testing process. He doubted the accuracy of the tests' ability to determine her capabilities, because of her general disinterest. He stated that on intelligence and educational tests, Green's performance was not up to the standard of a person with a ninth grade education and that this conclusion would be the same whether there was a head injury or not. He also felt that Green was exaggerating her physical and psychological symptoms and that her reported memory problems were due to emotional factors rather than organic ones. He also found that her patterns of neuropsychological dysfunction were secondary to her level of intelligence and educational exposure, rather than any particular accident. He stated that her general neuropsychological pattern was more consistent with an emotional and pre-morbid ideology, rather than lingering effects from a closed head injury. Finally, Dr. Black concluded that he found it difficult to determine whether or not Green's problems were attributable to the K-Mart accident.
Dr. Mehr testified regarding his findings, in relation to Green, using the PET scan. He performed the PET scan test on her in April 1999. His interpretation of the PET scan findings was that Green had nonspecific abnormalities which could have been caused by any number of different things, but which fit with traumatic brain injury. The medical term for that is posttraumatic encephalopathy. Dr. Mehr found that there were dominant abnormalities of hypometabolism (less function in the front and sides of the brain) in the frontal and temporal lobes of the brain. He stated that the frontal lobes deal with higher functions such as those that are not necessary to continue living, i.e., functions other than breathing, gross movement, and control of the functioning of internal organs. He stated these findings correlated with a diagnosis of traumatic brain injury and major depression. He further stated that the PET scan does not indicate schizophrenia because the abnormalities in the frontal cortex are not of the degree of those found in schizophrenics.
Dr. Mehr admitted that he recently spoke at a meeting of attorneys teaching them how to use PET scans in closed head injury cases and that he knew that Green had previously been diagnosed as having a traumatic brain injury. He further stated that if he had been given a history of drug or alcohol abuse or encephalitis, he would have concluded that the abnormalities were consistent with that type of history. He admitted that the history provided by the patient was important in his conclusion. He further stated that, if he had not been given the history of the patient, the nonspecific abnormality could have been caused by any number of factors, including *829 traumatic brain injury. However, he went on to state that it was more likely than not that Green's nonspecific abnormalities were caused by the K-Mart incident because he had been presented with no other information that would explain the abnormalities. He further testified that the results of the PET scan can be affected by movement of the patient, audio or visual stimulation, the alignment of the scanner to the patient, and medications the patient is currently taking.
Dr. Larry Carver, a psychiatrist with a sub-specialty in neuropsychiatry, was asked to evaluate Green and determine what, if any, relationship the injury has to do with Green's problems. Dr. Carver was of the opinion that Green was suffering from undifferentiated schizophrenia and/or secondary depression. He testified that he believed the depression was due to the onset of the schizophrenia. He stated that Green presented with three of the five factors necessary to diagnose schizophrenia, including delusions, both auditory and visual hallucinations, and negative symptoms. Dr. Carver also believed that some of her complained of physical symptoms were actually somatic delusions because there was very little organic medical evidence to support her numerous physical complaints. He stated that, in addition to the "little green man" incident, Green reported to him that she constantly hears murmuring or indistinguishable voices in the background.
As for the negative symptoms similar to those found in depression, Dr. Carver said that Green exhibited about ten of them, including: unchanging facial expression (blunted affect), decreased spontaneous movement, decreased amounts and content of speech, blocking or forgetting thought processes mid-way through, increased response latency, anhilidonia (decreased pleasure), and social inactivity. Concerning other testimony that Green suffered from major depression with psychosis, Dr. Carver stated that the bizarre nature of Green's hallucinations and the running commentary (hearing voices) is what differentiated Green as having schizophrenia rather than psychosis associated with depression. He also stated that he found very little evidence of post-concussive syndrome, especially because the CT scans and MRI were negative, which he felt was really unusual for a post-concussive syndrome diagnosis. Dr. Carver also felt that the timing of symptoms were not in line with the pattern usually exhibited in patients with post-concussive syndrome. He stated that the patient's condition generally improves over time in post-concussive syndrome, which is inconsistent with Green's worsening condition which is more attributable to schizophrenia. He also stated that schizophrenia cannot be caused by head injuries. Further, even if he were wrong about the schizophrenia diagnosis, Dr. Carver opined that a head injury or post-concussive syndrome would not cause major depression and psychosis.
Dr. F. Merritt Ayad, a licensed psychologist, saw Green at the request of Dr. Carver in June 2000 in order to assess her for psychosis and depression. He did not examine the medical records of Green and only performed two tests on herthe Rorschach Inkblot Technique and the Thematic Apperception Test (TAT). Dr. Ayad stated that Green was unresponsive toward his questions, so he questioned Ms. Marks, a friend who accompanied her to the office, to gain some historical information. Dr. Ayad testified that Green did not know basic information, such as how many children she had, when she last worked, why she left school in the tenth grade, and other important pieces of historical data. Regarding the Rorschach test, Dr. Ayad felt that Green's results were invalid because she only responded to *830 three of the ten cards. As for the twelve card TAT test, Dr. Ayad stated that she performed this test better. From this test, he found that Green was depressed and somewhat psychotic based on the stories she created after viewing cards depicting numerous scenes. He diagnosed Green as having a "major depressive episode, severe with psychotic features."
Dr. Jimmy D. Cole, a clinical psychologist, first saw Green in July 2000, in order to evaluate whether she would be a candidate for the rehabilitation program at Our Lady of Lourdes Hospital. He also diagnosed her with major depressive disorder with psychotic features. He further found evidence of post-concussive syndrome. Dr. Cole gave Green a rating of forty on a scale of one to one hundred in terms of her ability to function independently and interact with her family. In September 2000, Dr. Cole started Green on a comprehensive rehabilitation program that included physical, occupational, and speech therapy, and psychotherapy. He opined that Green would never be employable on a regular basis, nor did he believe that she would ever return to a normal and productive life. Dr. Cole stated that Green would require an attendant twentyfour hours per day due to her memory, behavior, and judgment problems. However, he stated that he did not think she was schizophrenic. He further stated that he felt her condition was directly related to the K-Mart incident because there was no other evidence or history to account for it. However, he admitted he was not a medical doctor qualified to diagnose and treat physical injuries, and he later agreed that brain damage was not the source of all of her emotional and psychological problems.
After considering all of the testimony, we hold the jury did not commit manifest error in finding that the K-Mart accident caused Green's subsequent injuries. While there was conflicting testimony given by the witnesses, it is exactly in this province that the jury is in a more advantageous position to assess credibility and weigh the competing factors. Apparently, the jury did not give any weight to Dr. Carver's version of events. There was sufficient medical testimony to suggest that Green's injuries resulted from the head injury from the falling platters at K-Mart. Additionally, it appears that none of the psychological problems suffered by Green were present before this accident. Therefore, it is presumed that Green's disabilities resulted from the accident since there was no evidence presented to suggest that, prior to this accident, she had any psychiatric problems whatsoever and that, since the accident, symptoms of a disabling psychiatric condition have continued to manifest themselves. See Francis v. Brown, 95-1241 (La.App. 3 Cir. 3/20/96), 671 So.2d 1041. Moreover, based on the medical testimony, it was not unreasonable for the jury to conclude that there existed a causal connection between the accident and the resultant injuries. Therefore, we find this assignment of error without merit.

Special Damages
The jury awarded Green $1.45 million in special damages. Green now argues that the jury should have awarded her the minimum sum of $3,458,453, for future medical care, because K-Mart presented no experts to refute the sums proposed by her own experts. K-Mart urges that Green should not have been awarded any special damages because causation was not established. First, in accordance with our above statements, the jury's finding that K-Mart was the cause of Green's injuries is not manifestly erroneous. Therefore, an award of special damages is appropriate.
*831 While we recognize the trier of fact's discretion in making an award of special damages, we equally recognize that such discretion is not unbridled. The jury's substantial reduction from the suggested award indicates to us that it apparently did not give appropriate credit to the expert testimony regarding the costs of her future care. The jury form indicates awards in the following amounts:

Past medical expenses $ 49,000
Future medical expenses $1,000,000
Past loss of income $ 26,000
Loss of earning capacity in the future $ 357,000

Dr. Robert Voogt, a rehabilitation specialist, testified as to Green's life care plan and the cost of her future medical expenses. In completing the life care plan, Dr. Voogt relied on Green's diagnosis of traumatic brain injury, severe post-concussive syndrome, severe major depression, and psychotic episodes. Based on a review of the medical records and his own observations of Green, Dr. Voogt felt that she was physically limited as follows: changes in sensation in the right arm; numbness in the fingers and hands; dizziness; impaired ability to bend, kneel, and stoop; difficulty with prolonged standing; decreased endurance; easily fatigued; impaired sleep patterns; changes in sense of taste and smell; bladder frequency and urgency; balance impairments; changes in vision; prescription glasses; possible changes in hearing; limited ability to cook, drive, and participate in household chores; gastritis; neck pain; headaches; upper and lower back pain; difficulty with lifting and grasping; and inability to meet her children's needs independently.
Dr. Voogt testified that Green's cognitive impairments included: impaired attention, memory, and reasoning skills; decreased concentration; minimal insight; poor problem solving; difficulty with sequencing, planning, following through on tasks, decision making, and following directions; periods of confusion; decreased safety awareness; changes in judgment and social skills; poor initiation; inability to follow stories or conversations; and disorganization.
Finally, he listed the emotional and psychological changes in Green as follows: poor eye contact, flat affect, loss of interest in previously enjoyed activities, anxiety, depression, suicidal ideation, nervousness, worry, reclusive, socially withdrawn, limited initiation of conversations, possible paranoia, limited interest in personal presentation, sadness, suspiciousness, psychotic episodes with visual and auditory hallucinations, thought blocking episodes, periods of confusion, and intolerance of children.
He further stated that her life care plan should address a person who has become totally disabled and cannot work or function in her day-to-day activities. He stated she would need a comprehensive rehabilitation program, ongoing counseling, short-term cognitive therapy, basic follow-up by physicians, and a case manager to ensure that monthly services were adequate. He determined figures based on sixteen-hour per day care and twenty-four-hour per day care provided by a certified aid for the next thirty-nine years. He also included home maintenance and medication costs.
The one time only costs included: $260 for a consult with a neuroopthamologist to investigate the relationship between Green's vision and her brain injury, $1,482 for therapeutic evaluations over five years, $102,000 for a comprehensive post-acute rehabilitation program lasting approximately six months, and $10,400 for counseling for two years. The total figure of these one time non-repeating costs is $121,552.
*832 According to Dr. Voogt, yearly costs included $330 per year for medical evaluations and treatment, $1,200 per year for case management, $80,300 for sixteen-hour per day support care or $120,450 for twenty-four-hour per day support care, $5,035 for maintenance costs, and $5,262 in medication expenses. These yearly costs total $92,127, for sixteen-hour per day care and $132,277, for twenty-four-hour per day care. Dr. Womack, an economist, testified that, after considering the present day value of these rehabilitative costs and after including the one time costs of $122,522, Green would need $3,458,453, for sixteenhour per day support care or $4,927,899, for twenty-four-hour support care in order to meet her medical expenses for the next thirty-nine years.
The defendant's medical experts corroborated the severity of the plaintiff's injuries. The costs of the plaintiff's future medical care was uncontradicted. "In evaluating evidence, the trier of fact should accept as true the uncontradicted testimony of a plaintiff witness absent a sound reason for its rejection." Johnson v. Ins. Co. of No. America, 454 So.2d 1113, 1117 (La.1984); while we must accord weight to the reasonable evaluations of fact by a trier of fact, an "appellate court is not required by this principle to affirm the trier of fact's refusal to accept as credible uncontradicted testimony, or greatly preponderant, objectively-corroborated testimony where the record indicates no sound reasons for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles." West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La. 1979). Where medical expenses are linked to the injuries suffered, as here, a plaintiff must be made whole. This legal principle was overlooked by the jury. The uncontradicted testimony of the plaintiff's expert should have been accepted by the trier of fact because there was no reason to doubt such testimony. See Johnson v. First National Bank of Shreveport, 00-870 (La. App. 3 Cir. 6/20/01); 792 So.2d 33, writ denied, 01-2770 (La.1/4/02); 805 So.2d 212. Thus, we find an abuse of discretion by the jury. The jury should have awarded at least the minimum amount of $3,458,453 for the costs of future medical care. We do so.

General Damages
The general rule is that a jury commits legal error in awarding special damages for medical expenses while at the same time denying general damages. Wainwright v. Fontenot, 00-0492 (La.10/19/00); 774 So.2d 70. We review the jury's failure to award general damages by asking whether the jury's determination that Green was entitled to a substantial award for medical expenses, but not an award for general damages, is so inconsistent that it renders the latter finding an abuse of discretion by the factfinder. Id. Based on the facts in the record, we find the jury did abuse its discretion in failing to award general damages.
The jury's substantial special damage award, including one million dollars for future medical care, is inconsistent with the finding that Green did not suffer any compensable pain and suffering associated with this accident. Because we have found an abuse of discretion, we conduct a de novo review of the record and render an award appropriate to the particular facts and circumstances presented in the record. Id. In these particular circumstances, we believe an award of $500,000 for general damages is appropriate.
In addition to the voluminous medical evidence presented by Green evidencing her depressive state following the accident, the following testimony was presented regarding *833 the sharp change in Green's personality and lifestyle following the accident.
Green, who was thirty-eight years old at the time of trial, testified that, as she was shopping for crawfish platters on the bottom shelf, the top shelf "apparently gave out and hit me and knocked me out." She stated that she was in good health and had been working prior to the accident, and that she had returned to work after the accident, but quit because she would get sick and have headaches. She could not recall how long she returned to work. She described having daily pain in her head, neck, upper back, and right arm. She stated that the pain occurred daily and that she also experienced weight gain following the accident.
Prior to the accident, Green enjoyed eating out, dancing, playing the slot machines at the casino, and taking her children on trips. She stated that the accident has affected her relationship with her kids and that one daughter (Latisha) has had to quit school in order to assist in her care. She stated that she has not been able to work since the accident and cannot provide her kids with even the basic necessities. She further testified that she no longer cooks, or attends to financial affairs, and that relationships with family members have suffered since the accident. She admitted seeing "a little green man" that would talk to her quite a few times, though not recently.
As to the accident in question, she stated she did not remember being hit by the trays and that she was not sure if it was the trays or the shelf that hit her. She stated that she lost consciousness as a result of the accident and that she has problems with memory and concentration since then.
Judy Reed, a lifelong friend of Green's, stated that she saw Green every week before the accident. She stated that they went and had their hair styled, nails done, or went out. She also stated they liked going to casinos. She testified that Green kept a clean house, cooked, and did all of the household chores prior to the accident and that she was a very good dresser and coordinated her outfits. She stated Green took a lot of pride in her appearance. Reed testified that Green told her about the little green men that talked to her after the accident and that she even called her three or four times screaming that the green men were standing at the foot of her bed and that she needed her help. Reed also said that Green does not want to go anywhere anymore, she does not clean her house, has no food in her refrigerator, never talks on the phone, never laughs and jokes, and that she cries a lot. Reed further stated that she accompanies Green to many of her appointments with Dr. Palazzo. She also stated that Green had a good relationship with her kids prior to the accident and that now she hollers at them for no reason.
Jody Hebert, Green's former supervisor at Fruit of the Loom, testified that Green had good work habits and got along with everybody. He said she was a pleasant worker, followed directions, and was very well dressed. He went on to say that the reason she was employed in her particular position was because she was neat and organized. However, when asked to look at employee attendance records, he recalled that she did have some attendance problems in the past.
Calvin Nora, a twenty year friend of Green's, stated that he saw her the day following the accident. He stated that she was disoriented and that she did not know his name. He stated that he told Green's daughter that something was wrong with her mother and that they should bring her to the emergency room. Nora testified *834 that, on the ride to the hospital, Green complained and even hollered that she was having head pain. He further stated that this strange behavior continued all the way to the emergency room. He said that the next day he called and was told by Green's daughter that she was having bad headaches. He also stated that Green was well dressed and "together," and that since the accident she has become withdrawn, unkempt, and short-tempered.
Reginald Jackson, who has known Green for approximately twenty-five years, testified that a lady from K-Mart called him to pick Green up after the accident. He stated that Green reported having a "little headache" and that she did not want to take the chance of driving home. He stated that Green was able to walk out of the store unassisted, but, as they got to the car, she "kind of fell toward the car a little bit and I just caught her and put her in the car." He also testified that he was unaware that she had been injured in a car accident.
Sondra Nelson, who has known Green for twenty years, testified that Green had a very close relationship with her children and that, since the accident, she hollers at them and cannot support them as before the accident. She stated that now Green just wants to be left alone and does not interact with anyone. She stated it is a chore just to get her out of the house. Nelson also testified that she takes Green to many of her doctors' appointments and, on a recent trip to a Piccadilly Cafeteria, she believed that everyone in the restaurant was laughing at her.
Ida Hill, Green's older sister reiterated what the other witnesses said about the change in Green's personality.
Lameka Broussard, Green's fourteen year old daughter, testified that her mother has become a different person since the accident. In sum, she stated that her mother no longer cooks or goes grocery shopping, does not attend school functions like she used to, is no longer well dressed and now goes three days without changing her clothes, no longer shops or gets her hair or nails done, hollers at her grandchild, and spends most days sleeping or laying around, staring into space, and watching television. According to Lameka, Green also no longer reads the newspaper or subscribes to magazines.
Latisha Vital, Green's twenty-year old daughter, testified that she started college at LSU in August 1997, but had to quit in January 1999, because her mother could no longer support her after the accident. She felt she needed to come home to take care of her family and has been the primary care giver for her mother since then. Latisha described the same changes in her mother as did Lameka. She stated that she and her siblings have to force her to get out of bed and do things. She claimed that her mother's personality has changed, that now she does not want to do anything, and that nothing excites her anymore.
Leola Celestine, Green's older sister, testified that she began working two jobs in April 2000 to help out her sister with the bills. She also stated that she had been appointed curator for her sister and now handles all of her finances. According to Celestine, her sister's relationship with her son has especially suffered and that she is "spaced out" all the time.
Based on this testimony and the medical evidence, we find that Green experienced pain and suffering, including loss of enjoyment of life, in association with this accident. Clearly, prior to this accident, Green was an active person, who often held two jobs and had a very active social life. Since the accident, Green has experienced physical limitations and severe emotional and psychological changes. Prior *835 employers, relatives, and friends all testified that Green did not exhibit any of the mental impairments she is now currently experiencing. Therefore, we find that an award of $500,000 is appropriate to compensate her for these injuries.

Loss of Consortium
Green urges that the jury abused it discretion in awarding her minor children, Lameka and Joseph Broussard, $10,000 each for loss of consortium. We agree. Loss of consortium damages are expressly allowed for the minor children of an injured party in La.Civ.Code art. 2315.
Loss of consortium contemplates something more than a loss of general overall happiness, but includes seven components: love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity. The elements of a minor child's claim for loss of consortium are essentially the same as the spouse's, without, of course, the sexual component.
Detraz v. Hartford Accid. & Indem. Co., 94-708 pp. 7-8 (La.App. 3 Cir. 12/7/94); 647 So.2d 576, 581. (citations omitted).
In this case, because the jury made an award, we use the standard set forth in Coco v. Winston, 341 So.2d 332 (La.1976). We find that the jury abused its discretion in awarding only $10,000 in loss of consortium to each child. Therefore, we raise the award to the lowest amount reasonably within our discretion in light of the jury's award which, although in error, should be respected and considered. Id. We find the lowest possible appropriate award for loss of consortium to each of the two minor children to be $25,000.
Numerous persons testified as to the dramatic change in personality experienced by Green. Essentially, the evidence showed that the children experienced role reversal in that they were placed in the position of having to care for their mother. Moreover, Parent testified that the children are depressed and despondent concerning the situation with their mother. It is clear from the record that Green was very involved in her children's activities prior to this accident and, that since then, they have been deprived of her love and affection. Lameka herself testified that her mother has basically become a completely different person since this accident. Apparently, the jury recognized this to some extent. Moreover, it was undisputed that Green can no longer provide for her children in the manner to which they are accustomed. We, therefore, find an award of $25,000 per child is appropriate.

CONCLUSION
The findings of the trial court are reversed in part and affirmed in part as amended. We reverse the jury's finding assessing Grandella S. Hamilton with 5% fault and find the defendant, K-Mart Corporation, bears 100% of the fault. Furthermore, it is now ordered, adjudged, and decreed that there be judgment in favor of the plaintiff, Sylvia B. Green, in the sum of $500,000 in general damages. It is further ordered that the judgment in favor of Lameka and Joseph Broussard is additionally amended to increase the award for loss of consortium damages from $10,000 each to $25,000 each and to increase the award of future medical expenses from $1,000,000 to $3,458,453. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendant, K-Mart Corporation.
AMENDED AND, AS AMENDED, AFFIRMED IN PART, REVERSED IN PART; AND RENDERED.
*836 WOODARD, J., Concurs in the Result.
GREMILLION, J., Dissents and Assigns Written Reasons.
GREMILLION, J., dissenting.
After re-argument of this case and careful reflection on the issues presented, my position remains the same. The jury awarded $1,000,000 in future medical expenses, apparently discounting Dr. Voogt's life care plan and the basis for it, as well as Dr. Womack's present day value of the rehabilitative costs suggested by Dr. Voogt. It is settled that the jury has vast and great discretion in making an award, and its award should rarely be disturbed by the appellate court. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Id. at 1261. As I noted, the jury's substantial reduction from the suggested award indicates that it did not give full credit to the expert testimony regarding the costs of the plaintiff's future care. Since the nature of such care is inherently speculative, I cannot find that the jury abused its discretion. Moreover, simply because a witness testifies in a certain manner does not require the factfinder to believe the witness's testimony in its entirety, even in the face of no contradictory testimony presented by the other party. Certainly, a defendant does not have to present expert witnesses to contradict the expected life care costs proposed by the plaintiff. The jury is free to evaluate the entire trial testimony as a whole and draw reasonable conclusions from it. After considering all of the evidence, I find that the jury reasonably awarded this plaintiff $1,000,000 in future medical costs and did not abuse its vast and great discretion in doing so. I, therefore, respectfully dissent from the majority's opinion in reversing the jury's finding and increasing the award of future medical expenses. In all other respects, I agree with my colleagues on the majority.
NOTES
[1] In late November 1999, Green was interdicted and declared incompetent and incapable of taking care of herself or administering her estate. Leola Celestine was appointed curatrix of Green; however, we refer to the plaintiff as Green throughout this opinion.
[2] Based on the award amount, Hamilton would be responsible for $72,000 of the judgment.
[3] The jury placed a zero next to the lines indicating awards for "past physical and mental pain and suffering," "future physical and mental pain and suffering," and "loss of enjoyment of life & lifestyle."
[4] A nuclear physician uses radioactive materials in the diagnosis and treatment of disease. PET stands for positron emission tomography.