924 So.2d 267 (2006)
Jason William HAMILTON and Catherine Hamilton
v.
Carey E. WINDER, M.D. and the Orthopedic Clinic, Inc. (A Professional Medical Corporation).
No. 2004 CA 2644.
Court of Appeal of Louisiana, First Circuit.
February 10, 2006.
Rehearing Denied March 30, 2006.
*268 Pamela L. Ashman, Donna U. Grodner, Charlotte C. McDaniel, Baton Rouge, Counsel for Plaintiffs/Appellants Jason William Hamilton and Catherine Hamilton.
Herbert J. Mang, Jr., Tara S. Bourgeois, Baton Rouge, Counsel for Defendants/Appellees Carey E. Winder, M.D. and Baton Rouge Orthopedic Clinic, Inc.
Before: WHIPPLE, McCLENDON, and WELCH, JJ.
McCLENDON, J.
In this medical malpractice suit, plaintiffs appeal a jury verdict in favor of the defendants. For the reasons that follow, we vacate the judgment and remand for further proceedings.

FACTS AND PROCEDURAL HISTORY
On February 12, 2000, while playing with the Baton Rouge Kingfish hockey team in Lafayette, the plaintiff, Jason Hamilton, suffered an elbow laceration. The cut required three stitches and was sutured at the hockey game by the attending physician of the opposing team, the Lafayette Ice Gators. Mr. Hamilton was also given antibiotics by said physician. Upon his return to Baton Rouge, Mr. Hamilton complained of swelling and pain in the elbow, and was seen by the defendant, Dr. Carey Winder, an orthopedic surgeon and the Kingfish team physician. Dr. Winder, noting the possibility of infection, drew fluid from the olecranon bursal sac in Mr. Hamilton's elbow and ordered a cell count and culture on the fluid drawn. The result of the culture was negative and Dr. Winder diagnosed Mr. Hamilton with post-injury bursitis. Mr. Hamilton continued to experience pain and swelling despite treatment by Dr. Winder, who performed surgery on Mr. Hamilton's left elbow on March 21, 2000. Mr. Hamilton remained in the care of Dr. Winder, and continued antibiotic treatment, but had continued complaints of pain and tenderness. On May 5, 2000, surgery was again performed by Dr. Winder for debridement of infection in the elbow that had gone deep into the bone. The infection was identified as staphylococcus aureus (staph) and because of said staph infection, Mr. Hamilton was placed on intravenous antibiotics. Subsequently, Mr. Hamilton sought treatment with an *269 infectious disease specialist, Dr. Candace Warner. The bone infection eventually resolved while Mr. Hamilton was under the care of Dr. Warner and Dr. Winder.
Following his treatment, Mr. Hamilton filed a medical complaint against Dr. Winder and Dr. Winder's employer, The Orthopedic Clinic, Inc., alleging negligent treatment and diagnosis which allegedly ruined his hockey career. On December 6, 2001, a medical review panel convened, but was continued to allow for the submission of additional evidence. Following the admission of the additional medical records, the panel, on January 21, 2002, concluded that the evidence did not support the allegations that defendants failed to meet the appropriate standard of care.
On February 13, 2002, Mr. Hamilton and Catherine Hamilton filed the present action against Dr. Winder and the orthopedic clinic, alleging that Dr. Winder failed to timely and adequately diagnose and treat Mr. Hamilton's injury.[1] Specifically, plaintiffs alleged that defendants failed to prescribe antibiotic treatment for Mr. Hamilton, or prescribed inadequate antibiotic treatment; failed to order cultures and cell counts as necessary; failed to order timely cultures; repaired Mr. Hamilton's tendon triceps avulsion without his consent; and failed to make an infectious disease referral once the staph infection was discovered. Plaintiffs contended that defendants' actions were below the standard of care required of them, which prolonged Mr. Hamilton's elbow infection, and resulted in a buy-out of Mr. Hamilton's contract to play professional hockey and an inability to secure any contracts with National Hockey League teams. Mr. Hamilton sought damages including past, present, and future pain and suffering, loss of earning capacity, disability, medical and pharmaceutical expenses, loss of consortium with his wife, loss of enjoyment of life and inconvenience, and loss of income and/or earning capacity. Mrs. Hamilton also sought damages for the loss of consortium with her husband and for loss of enjoyment of life and inconvenience.
Following a trial on the merits, a jury verdict was returned on May 25, 2004, in favor of the defendants, and judgment was signed on June 16, 2004. Plaintiffs now appeal assigning eight errors of the trial court. Because we determine that the first assignment of error is dispositive of the matter on appeal, we pretermit discussion of plaintiffs' other assignments of error.

DISCUSSION
The jury trial in this matter commenced on May 18, 2004. On the first day, twelve jurors were seated, including Jonathan Veal. On May 19, 2004, the second day of trial, at approximately 9:10 a.m., the trial court disqualified Mr. Veal based on unavailability and struck him from the jury.[2] At the beginning of court on the morning of the 19th, the following exchange occurred between the court and plaintiffs' counsel:
The Court: Good morning. It's now ten minutes after 9:00. We were supposed to start at 9 o'clock. Mr. Veal is Juror Number 305, sitting in position of No. 6. He is not present. Mr. Veal has been late for every break we have taken. *270 He has not been on time once coming back. I admonished him yesterday in private.[3] I told him he needed to be on time. We needed to be able to start, because he was keeping everybody waiting. All the rest of the jurors are here. Everything is ready to go. I'm going to bump Mr. Veal, and use the alternate, Ms. Johnson, as our twelfth juror. If we lose somebody after this, we'll have to see whether there's agreement on 11 or if  a mistrial.
Ms. Grodner: Your Honor, I would like to be heard.
The Court: Yes ma'am. Go ahead. You may put your objection on the record, but it is a done deal.
Ms. Grodner: Thank you, Your Honor. Your Honor, it's only ten minutes after 9:00. Additionally, this juror was picked to serve on this jury. The plaintiff has a right to the jury that he selected. We ask, Your Honor, to please issue an instanter, have a deputy go to his house and get him and bring him in here. And that he be admonished in some formal fashion by the court. But ten minutes is a little soon to cut somebody from a juror  from a jury, especially when there's been no attempt to use the court's power to secure his presence here.
The Court: Thank you.
Thereafter, the trial court took up a preliminary matter and then brought in and polled the jury. Mr. Veal was not present; his alternate was present and the trial court ordered the trial to proceed.
At the end of testimony for the day, the following discussion took place:
Ms. Grodner: Judge, excuse me 
The Court: Before they go?
Ms. Grodner: Yes, sir.
The Court: Yes. Approach, please.
(Whereupon, a bench conference was had.)
Reporter's note: The tape recorder was not working at the bench.
The Court: Thank you. The jurors are excused for the evening. I'll see you in the morning.
(Jury out.)
The Court: All right. You may be seated. Clarification concerning Ms. Grodner's last concern that the jury might get the idea that if they just don't show up, they'll be shipped off the jury and go home. Mr. Veals (sic) has been here all day. He's still here. He didn't arrive until after 9:30 this morning. We didn't put it on the record. What we had discussed about before, but I do want it on the record. That I came in at 9 o'clock and informed counsel that we were still waiting on Mr. Veal. I came in at five after 9:00 and informed counsel that Mr. Veal was not here, and if he didn't show up in five minutes, we were going to bump him and go with the alternate. That was because this case appears to be  is going to go longer than the four days that it was scheduled, and I'm trying to move it along within the time I was told by counsel that it could be done. Mr. Veals (sic) had shown a tendency not to be on time, and known to have been late after every break we had taken. He had not called our office to say he was running lately or why he was running late, as jury management instructs the jurors to do, *271 and that was the reason he was excused. I'll see ya'll tomorrow at 9 o'clock.
With regard to removal and replacement of jurors, LSA-C.C.P. art. 1769 B provides that "[a]lternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties."[4] To determine whether a juror was properly dismissed for unavailability under LSA-C.C.P. art. 1769 B, we must examine the record to ascertain whether it establishes the juror's unavailability to perform his or her duties. This examination must be thorough and must balance the discretion of the court to manage its docket with the right of the litigants to have their dispute tried by the jury that they selected.
In this matter, plaintiffs assert that the trial court erred when it dismissed Mr. Veal for tardiness without first attempting to contact him to determine his inability or disqualification to serve. Conversely, defendants contend that the trial court did not abuse its discretion in dismissing Mr. Veal, claiming that the present issue was decided in the case of State v. Williams, 500 So.2d 811 (La.App. 1 Cir.1986).
In the Williams case, this Court upheld the dismissal of a juror who had arrived late, and who failed to call the court to advise that she would be late. However, the trial court in Williams made a telephone call to the juror's house prior to the juror's dismissal to determine her availability. There being no answer, the trial court replaced the juror. In the case before us, no telephone call was placed to Mr. Veal, nor was any attempt made to have contact with him. Thus, we find the Williams case to be distinguishable.
Further, guidance for determining the minimal requirements for unavailability of jurors can be found by a comparison and examination of the cases of State v. Cass, 356 So.2d 396 (La.1977), and State v. Clay, 441 So.2d 1227 (La.App. 1 Cir.1983), writ denied, 446 So.2d 1213 (La.1984). In Cass, the trial court summarily dismissed a juror in open court after observing the juror apparently sleeping for two to four minutes. The Louisiana Supreme Court on appeal reversed, finding that legal cause did not exist to dismiss the juror, stating that the trial court erred in failing to allow the parties to question the juror, on the record, as to his inability to perform his duties. Cass, 356 So.2d at 397-98. In contrast, in the Clay case, the dismissal of a juror was upheld where the juror telephoned the trial court on the morning of the second day of trial stating that she was unable to attend trial because of some accident or a problem in her family that required her presence. Unlike the Cass case where the juror was available for questioning, the juror in Clay was unavailable. This Court stated that where Clay differs materially from Cass "is the discharged juror's unavailability for questioning as to her inability or incompetency to serve." Clay, 441 So.2d at 1231. Thus, the trial court acted in a prudent manner when it replaced the juror.
Further, in the civil case of Green v. K-Mart Corporation, 01-675 (La.App. 3 Cir. 6/18/03), 849 So.2d 814, aff'd in part, rev'd in part on other grounds, 03-2495 (La.5/25/04), 874 So.2d 838, the Third Circuit found no error in the dismissal of a juror who was fifty minutes late on the fourth day of trial. In Green, the trial court had also tried unsuccessfully to contact *272 the juror by telephoning him at the number given to the court on his juror questionnaire. The court in its reasoning agreed with the First Circuit's decision in Clay that an absent and unavailable juror cannot be questioned as to his inability to perform his duties. The Third Circuit determined that after making reasonable efforts to contact the juror and delaying the progress of the trial by fifty minutes, the trial court did not abuse its discretion in disqualifying the juror. Green, 01-675 at pp. 5-6, 849 So.2d at 821.
The key distinguishing factor between the above cases and the present case are the attempts by the various courts to contact the juror to determine his or her unavailability or actual contact with the juror establishing that said juror was unable to serve. Thus, the establishment of the unavailability of a juror requires either an attempt by the trial court to contact the absent juror to determine his or her unavailability or actual contact or information regarding the juror's unavailability.
In the case sub judice, no attempt was made to contact Mr. Veal to determine his availability to serve as a juror, nor is there any information that Mr. Veal was unavailable to serve. The record indicates that the trial court did not attempt in any manner to contact Mr. Veal before disqualifying him. The court simply determined after ten minutes that Mr. Veal was unavailable.[5] Consequently, we find that the trial court erred in summarily removing Mr. Veal as a juror under these circumstances without first determining his unavailability.
There being no way to determine what effect the retention of the juror would have had on this verdict, we vacate the judgment of the trial court and remand for a new trial.[6]

CONCLUSION
For the foregoing reasons, we vacate the June 16, 2004 judgment of the trial court in favor of the defendants, Carey E. Winder, M.D. and The Orthopedic Clinic, Inc., and against the plaintiffs, Jason William Hamilton and Catherine Hamilton, and remand this matter for a new trial. Costs of this appeal are assessed to the defendants.
JUDGMENT VACATED; REMANDED FOR NEW TRIAL.
WHIPPLE, J., concurs.
NOTES
[1] At the time suit was filed, Catherine Hamilton was Mr. Hamilton's spouse although a petition for divorce was filed and they were separated.
[2] We note that this was the first full day of trial following the empanelment of the jury the previous day. The record indicates that the jury was selected and sworn in, following which, a lunch recess was taken until 2:00 p.m.
[3] Although the trial court stated it admonished Mr. Veal, it appears that no record was made of this exchange.
[4] Similarly, the pertinent part of LSA-C.Cr.P. art. 789 A provides that "[a]lternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties."
[5] Further, we note that Mr. Veal actually appeared in court between 9 a.m. and 10 a.m. but was not questioned by the court.
[6] While we acknowledge that LSA-C.C.P. art. 1797 B requires only the concurrence of nine jurors to render a verdict, we cannot say what effect the removal of a juror would have had on deliberations and the outcome of the trial in this ten to two jury verdict.